In the United States District Court
for the Eastern District of Virginia
Norfolk Division

| | |
|---|---|
| Chris Gagliastre, *et al.*, *On behalf of themselves and others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> Captain George's of South Carolina, LP, *et al.*, <br><br> Defendants. | Case No. 2:17-cv-379 <br><br> Judge Raymond A. Jackson <br><br> Magistrate Judge Robert J. Krask |

Plaintiffs' Supplement to Plaintiffs' Motion for Approval of FLSA Settlement (Doc 249) and Plaintiffs' Motion for Attorney's Fees and Expenses (Doc. 251)

A Fair Labor Standards Act case is an exception to the general rule that courts act as neutral arbiters. In FLSA cases, courts must scrutinize proposed settlements in order to protect the FLSA's underlying public policies. *Taylor v. Progress Energy, Inc.*, 493 F.3d 454, 460 (4th Cir. 2007) (superseded by regulation related to the FMLA). A settlement that is contrary to the public interest, even if beneficial to an individual worker (or group of workers), endangers the FLSA's protections as a whole, thus pressuring all workers' wages.

In that context, on March 4, 2019, the Court held a hearing about Plaintiffs' motions to approve an FLSA settlement and for an award of attorney's fees and expenses (Docs. 249–252). At the hearing, the Court asked Counsel to supplement their motion for fees with Counsels' itemized expense and billing records and to provide an expert report justifying Counsels' hourly

rates. This Supplement responds to the Court's request for additional fee and expense detail. In addition, Plaintiffs respond to the Court's questions raised at the hearing.

1. **Statement on the Settlement Itself and Fees in General**

Before delving into the specific issues regarding the settlement, Plaintiffs and Counsel would like to briefly address their position regarding the settlement.

This is a good settlement. The settlement allocates $2,444,804.55 to 373 restaurant workers. This is a significant, positive result for a lot of workers, even after the proposed fee award. *Compare to Bredbenner v. Liberty Travel, Inc.*, No. Civ.A. 09-1248, 2011 WL 1344745, at *19 (D.N.J. Apr. 8, 2011) (holding that a $3 million fund for over 1,000 class members was a significant benefit).

What's more, the settlement is not the end of the road for many of those workers. They have retained their rights to bring additional, state law claims against Defendants. Those claims are currently pending before a South Carolina state court.

The parties' reaction to the settlement is telling. Counsel has received several compliments from the workers about Counsels' diligence in pursuing the case. A number of opt-ins also had positive things to say about the named plaintiffs, who stood up for their fellow workers.

In contrast, Defendants attempted to make last-minute changes to the Settlement Agreement that their own counsel almost entirely wrote, even going so far as to bring in new counsel to facilitate those arguments. Tellingly, the two people (Defendants and their prior counsel) able to discuss what was agreed upon did not show up to the Approval Hearing. It appears that, if Defendants had their druthers, they would blow up the settlement entirely. If Defendants

are that unhappy with the bargain, the Agreement must, at a bare minimum, be a fair deal for the workers.

Settlements, like the one in this case, support the FLSA's public policies and enforcement. But, they do not happen without attorneys who are willing to develop wage and hour and class/collective action expertise, take on a substantial risk of non-payment, and perform the enormous amount of work involved in one of these cases. "Class counsel play a vital role in protecting the rights of class members." *Thomas v. FTS USA, LLC*, No. 3:13-CV-825, 2017 WL 1148283, at *2 (E.D. Va. Jan. 9, 2017), *report and recommendation adopted*, No. 3:13-CV-825, 2017 WL 1147460 (E.D. Va. Mar. 27, 2017).

Counsel fought hard to achieve the result now before the Court. Counsel believes that they did so diligently and professionally. They are proud of their work and this result, and believe that they should be compensated for their efforts.

As the *Thomas* court acknowledged in the consumer protection context, "the Court must ensure that counsel receive compensation for their work." *Id.* Succumbing to the temptation to give more to the opt-ins, at Counsels' expense, is neither fair nor supportive of the FLSA's policies, which require competent counsel to work on these cases.

**2. Responses to Questions and Issues Raised at the Approval Hearing**

At the March 4th Approval Hearing, the Court raised a number of questions and issues related to the proposed settlement. Plaintiffs' counsel responded to the questions at the hearing, but Counsel also wanted to provide some additional information or details here.

### a. Damages Calculation

The Court asked Counsel whether they hired an expert to calculate damages in this case. Counsel did not hire an expert. As explained at the hearing, the damages, by their very definition, are based on the recorded hours that each opt-in plaintiff worked compared to the recorded wages paid to those workers. Thus, the damages can be calculated by examining Defendants' payroll records and without an expert.

Plaintiffs understand that this question may stem from the Court's recognition that it is easy for (unscrupulous) plaintiffs' attorneys to minimize damages in order to make a settlement look more generous than it is, once in a settlement posture. As an astute follow-up, the Court asked what Counsels' initial damages calculation was. A substantial difference would indicate a problem.

At the hearing, Counsel was unsure of the precise number but believed it was fairly close to what was included in Plaintiffs' Motion for Settlement Approval ($1,671,722.84 in unpaid wages (Doc. 250, PAGEID 3689)). Now, with the benefit of Counsels' review of the file, the answer is $1,655,946 in unpaid wages. *See* Ex. 1, Declaration of Andrew Biller, ¶ 3. Counsel gave this calculation to Defendants by letter dated September 19, 2018 as part of a settlement demand.[1] The $1,655,946 estimate was for the unpaid wages arising from any of the tip credit-related claims.

The small difference in numbers is attributable to a few things. First, the September number was calculated without the benefit of full discovery of Defendants' records. Second, the

---

[1] The demand also set forth damages calculations for the state law claims that were, at the time, part of the case. Likewise, the calculations included an estimate for off-the-clock time. Later in the case, Plaintiffs voluntarily dismissed that claim without prejudice. The Settlement Agreement excludes all of those claims from the release. Thus, any employee may bring a case for unpaid off-the-clock work or state law claims regardless of whether they receive a payment under the Settlement Agreement.

4

number was based on fewer opt-ins than are covered by this settlement (349 versus 373). Third, the September number did not account for money that Defendants paid to busser, buffet runner, and bartender employees ("BBBs") above the tipped minimum wage to take them from tipped minimum wage plus tips to the wage Defendants promised them, which was generally around $10 per hour. Each store had a different average "supplemental" payment to BBBs each hour, which Defendants are given a credit for in the final settlement.[2] Thus, the original number needed to be increased to account for additional opt-ins, but then decreased to account for Defendants' additional payments to certain opt-ins.

The other relevant number relates to the "tools and uniform" settlement. There, in September 2018, Plaintiffs estimated unpaid wages to be $34,900 based on 349 employees being entitled to a $100 reimbursement for charges related to uniforms and tools. Biller Declaration, ¶ 3. This ended up being an overestimation because discovery revealed that (1) Defendants did not require specialized shoes for the job, (2) the cost of the uniforms was $18 per server, (3) not every opt-in purchased a uniform (only servers purchased uniforms), and (4) the other "tools" policies may not have been enforced. Ultimately, this claim settled for an additional $9,992. In light of what was revealed in discovery, this settlement amount is appropriate.

Initial damages calculations aside, Plaintiffs note that the Settlement Fund's size compared to number of workers, types of workers, and claims involved indicates, independently, that the settlement is fair and reasonable. Though not dispositive, it does provide useful context.

---

[2] The South Carolina location subsidized BBBs' wages and tips with an additional $1.24 per hour, on average. The North Carolina location paid an additional $2.66 per hour to BBBs, on average. The Virginia Beach location paid an additional $1.67 per hour to BBBs, on average. The Williamsburg location paid an additional $2.77 per hour to BBBs, on average.

5

Plaintiffs hope that this additional information helps allay any concerns that the Court might have. If the Court needs additional information, Plaintiffs can also provide Defendants' payroll spreadsheets to the Court for the Court's own analysis of damages. Under the terms of the protective order in place, this information may need to be filed under seal or submitted for an in camera review. Plaintiffs simply ask that the Court notify them whether the Court would like to review the payroll records so that Plaintiffs can prepare and produce them in Excel format.

### b. Settlement Agreement Distribution Sections

During the March 4th Approval Hearing, the Court asked questions about several sections of the Settlement Agreement, specifically Sections 3.2, 4.2, and 5.2. Those three sections deal with distributing money from the common fund. Of relevance to the Court's inquiry, the sections state:

> The [Specific Type of] Settlement Fund shall be distributed by Settling Defendants, on October 1, 2019, or other such date as the Court may direct by order, as follows: (a) payment to counsel for plaintiff of attorneys' fees and costs, in such amount as the Court shall award by order; and (b) payment of the sum remaining after deduction of attorneys' fees and costs paid pursuant to (a), to Plaintiffs pro rata to [number of hours worked, overtime hours worked, or servers, depending on which section].

Plaintiffs want to take this opportunity to further address the Court's questions regarding this section.

First, the Court expressed concern over the order in which people are paid under the Sections; *i.e.*, first fees and costs are deducted and then the remaining fund is divided among the plaintiffs. As an initial matter, Counsel are not paid first under this section—Counsel and all plaintiffs are paid simultaneously. The reason the Sections are drafted to first deduct fees and expenses is because, although the total Settlement Fund is known, the amount of fees and expenses are not known until the Court issues an award. Thus, the only way to tell how much each plaintiff

6

will receive under the agreement is to first take the total Settlement Fund, deduct any amounts awarded for fees and costs, and then calculate individual plaintiff awards under the Agreement. This procedure is necessary because no part of the Settlement Fund reverts to Defendants. Thus, whatever is not allocated to fees, expenses, and service awards will go to the plaintiffs. The result is that each plaintiff pays a prorated portion of fees and expenses.

Second, the Court questioned whether a fee-related appeal would hold up paying the plaintiffs. Admittedly, the Agreement does not describe that precise scenario. Section 9.4, however, states that the Settlement Agreement is not contingent on any particular fee or expense award. Thus, under Section 9.4, it seems reasonable that whatever portion of the class's money is not in controversy could be distributed because it is "not contingent on any particular fee or expense award." The remainder that is in controversy could be temporarily retained, pending an appeal.

Third, the Court asked about the purpose of the October 1, 2019 deadline for payments to Plaintiffs and their counsel. As stated at the hearing, Defendants' restaurant business is cyclical. Because the restaurants are in vacation destinations, they are very busy during the summer and early fall months, and slow during the winter months. The payment date was chosen to allow Defendants time, during Defendants' busy season, to accumulate sufficient funds to pay the large Settlement Fund amount. Even so, Sections 3.2, 4.2, and 5.2 allow the Court to set another date for distribution.

### 3. Percentage-of-the-Fund versus Lodestar Methods of Fee Awards

As the Court noted at the Approval Hearing, the Court has discretion to use either the "lodestar" method or the "percentage-of-the-fund" method to determine a reasonable fee award.

Here, Plaintiffs' Counsel asks that the Court award 33.33% of the common fund. *See* Doc. 252, PAGEID 3734. Counsel believes that they have done good work in this case, took on a substantial risk, and should be rewarded for their efforts.

"District Courts within this Circuit have [ ] favored the percentage of the fund method." *Thomas v. FTS USA, LLC*, No. 3:13-cv-825, 2017 WL 1148283, at *3 (E.D. Va. Jan. 9, 2017), *report and recommendation adopted*, No. 3:13-cv-825, 2017 WL 1147460 (E.D. Va. Mar. 27, 2017). Indeed, courts "across the nation favor the percentage method of computation." *Id.*; *see also DeWitt v. Darlington Cty., S.C.*, No. 4:11-cv-740, 2013 WL 6408371, at *6 (D.S.C. Dec. 6, 2013) ("The trend among most courts seems to be towards favoring the percentage-of-the-fund approach to awarding attorney's fees in class action cases…").

The percentage-of-the-fund method ties a fee award to the overall result in a case, making it an attractive option. *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 260 (E.D. Va. 2009). In analyzing the percentage-of-the-fund method in securities litigation, Judge Algenon Marbley noted:

> …the percentage approach encourages efficiency, judicial economy, and aligns the interests of the lawyers with the class in large securities cases. While the lodestar approach incentivizes attorneys to work more hours, without regard to the quality of the output or the class's needs, the percentage approach instead "rewards counsel for success and penalizes it for failure." Not only is the Court spared from the costly task of scrutinizing counsel's billable hours, but attorneys are discouraged from padding hours and encouraged to work more efficiently. Furthermore, because the attorneys receive a higher fee if they obtain a higher settlement, the interests of the class and the attorneys are aligned.

*In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752, 762 (S.D. Ohio 2007) (providing an in-depth discussion about calculating a reasonable fee). Like other cases involving a common fund, the percentage-of-the-fund method is appropriate in FLSA cases. *See, e.g., Hatzey v. Divurgent, LLC*, No. 2:18-CV-191, 2018 WL 5624300, at *4 (E.D. Va. Oct. 9, 2018), *report and*

*recommendation adopted sub nom. Hatzey v. Divurgent, LLC.*, No. 2:18-CV-191, 2018 WL 5621967 (E.D. Va. Oct. 30, 2018).

Counsels' request is not only consistent with the preferred method "across the nation," it is consistent with Counsels' representation agreement with the named plaintiffs. Biller Declaration, ¶ 6. Further, individuals who joined this case authorized the named plaintiffs to make decisions on their behalf. *See* Sample Opt-in Form, Doc. 127-1, PAGEID 1935. As the Court held in its Order granting conditional certification, the Notice "properly informs putative class members that Plaintiffs' counsel is retained on a contingency fee basis." Doc. 126, PAGEID 1924.

With respect to the requested percentage itself, 33.33% is "a fairly common percentage in contingency cases." *DeWitt*, 2013 WL 6408371, at *9. The *DeWitt* court observed that fee awards "generally range anywhere from nineteen percent (19%) to forty-five percent (45%) of the settlement fund." *Id., quoting Bredbermer v. Liberty Travel, Inc.*, 2011 WL 1344745 (D.N.J. Apr. 8, 2011). For example, one court in this district recently held that an award of fees equal to one third of an almost identical settlement fund was reasonable. *Hatzey*, 2018 WL 5624300, at *5. "[A]ny discussion of percentage awards should acknowledge the age-old assumption that a lawyer receives a third of his client's recovery under most contingency agreements." *Thomas v. FTS USA, LLC*, 2017 WL 1148283, at *5 (E.D. Va. Jan. 9, 2017), *citing* NEWBERG ON CLASS ACTIONS § 15.73 (5th ed.).

The question before the Court is whether the Settlement Agreement and proposed fee award is fair. Awarding the exact amount to which the plaintiffs agreed, a "fairly common percentage in contingency cases," is fair.

4. **Lodestar Crosscheck**

The Court has asked that Counsel provide their billing records so that the Court can examine Counsels' lodestar, rates, and hours expended. Counsel is attaching those records for the Court's review. *See* Ex. 4, Billing Records for Markovits, Stock & DeMarco and Biller & Kimble (for both *Gagliastre v. Captain George's* and *Smith v. Captain George's*); Ex. 5, Billing Records for Morgan & Morgan; Ex. 6, Billing Records for Pierce McCoy; Ex. 7, Billing Records for Wukela Law Firm.

The records Counsel submitted are redacted to remove things like litigation strategy, the topics of conversation amongst counsel, and specific areas of law researched. *See Chaudhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir. 1999). Billing records that contain "the specific nature of services provided" are generally privileged. *Id., quoting Clarke v. Am. Commerce Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992). Where Counsel removed text from an entry, Counsel marked the record with an "X." An additional column (not produced) contains the redacted information. With this Supplement, Plaintiffs will also file a motion to send the unredacted records to the Court for an *in camera* review.

A summary chart of the lodestar information is below:

| Attorney | Firm | Rate | Hours | Total |
| --- | --- | --- | --- | --- |
| Andy Biller | Markovits, Stock & DeMarco / Biller & Kimble | $400 / $450 | 505.5 | $204,555.00 |
| Andrew Kimble | Markovits, Stock & DeMarco / Biller & Kimble | $325 / $385 | 900.7 | $312,487.50 |
| Philip Krzeski | Markovits, Stock & DeMarco / Biller & Kimble | $250 | 272.6 | $68,150.00 |

| MSD & BK Office Staff | Markovits, Stock & DeMarco / Biller & Kimble | $125 | 239.1 | $29,887.50 |
| --- | --- | --- | --- | --- |
| C. Ryan Morgan | Morgan & Morgan | $450 | 87.1 | $39,195.00 |
| Andrew Frisch | Morgan & Morgan | $450 | 68.4 | $30,780.00 |
| M&M Office Staff | Morgan & Morgan | $125 | 20.8 | $2,600.00 |
| Josh Jewett | Ervin Jewett / Pierce McCoy | $300 | 25.2 | $7,500.00 |
| Julia Rust | Pierce McCoy | $250 | 3.7 | $917.50 |
| Patrick McLaughlin | Wukela Law Firm | $300 | 13.2 | $4,650.00 |
| **Total** | | | **2,136.30** | **$700,722.50** |

The Court will notice some differences between the information presented in this supplement and the information presented in Plaintiffs' Memorandum in Support of Plaintiffs' Motion for an Award of Attorney's Fees and Expenses (Doc. 252).

Most notably, the lodestar numbers presented here are higher than those presented in Document 252 because Counsel has put in additional attorney time since their Motion for Award of Attorneys' Fees was filed on February 4, 2019.

In addition, in drafting Plaintiffs' Memorandum in Support, Counsel presented summary information regarding their rates and hours. That information was based on a far less thorough analysis of Counsel's billing records than what was done for this Supplement. Counsel reasoned that, if the Court elected to use a percentage-of-the-fund method of analysis, it might conduct a more limited review of Counsel's lodestar because "[c]ourts generally do not apply the same scrutiny in a lodestar cross-check as they do when using the lodestar method to calculate the fee." *Thomas*, 2017 WL 1148283, at *6. Thus, if the Court elected to conduct a summary lodestar cross-

check, it would not have added any value for Counsel to conduct a detailed review of their fee records.

Because the Court requested Counsels' billing records, Counsel endeavored to provide complete records. The lodestar numbers above take into account all of the time contemporaneously recorded in Counsel's billing records, which are attached. In addition to the lodestar numbers for this case, the above numbers also include the hours worked by Plaintiffs' counsel in *Smith v. Captain George's of South Carolina, LP*, which the parties have sought to consolidate and include in the settlement of this matter. Those hours were not accounted for in Document 252. The above numbers also include the hours worked by Patrick McLaughlin, who was the original South Carolina-based local counsel in the *Gagliastre* matter, and is currently local counsel in the *Smith* matter. Mr. McLaughlin was likewise unaccounted for in Document 252. Last, Document 252 inadvertently cited the approximate number of hours worked by Mr. Kimble prior to departing for the December 13, 2018 mediation, rather than the hours worked up to the date of the February 4, 2019 fee petition. The Court will also note that 40.4 hours worked by former MSD associate Eric Kmetz referenced in Plaintiffs' Motion for an Award of Attorneys' Fees (PAGEID 3738) has been removed from Plaintiffs' fee records. Upon closer examination of those records, they are improperly "block-billed," and since Mr. Kmetz is no longer with the firm, Plaintiffs' Counsel is unable to seek clarification of those hours. Although not required, Counsel elected to remove those hours altogether.

In addition to those contemporaneously recorded hours not accounted for in Document 252, the above summary numbers *also* include email time for Messrs. Biller and Kimble. Messrs. Biller and Kimble did not contemporaneously record most of their email time. *See Gregory v. Belfor*

12

*USA Grp., Inc.*, No. 2:12-CV-11, 2014 WL 468923, at *4 (E.D. Va. Feb. 4, 2014) (holding that contemporaneous records are not necessarily required). Instead, Messrs. Biller and Kimble examined their email records, determined the total emails sent or received in the case, and added a tenth of an hour for each such email. This added approximately 247.5 hours for Mr. Biller and 269.6 hours for Mr. Kimble. The additional lodestar amount is $99,000 for Mr. Biller and $87,620 for Mr. Kimble. *See* Ex. 2, Biller Declaration; Ex. 3, Kimble Declaration. To account for any potential duplication or other issues, both attorneys then reduced the estimated email lodestar by 20%. As such, the total amount requested for these emails is $149,296.

Finally, the above summary does not include the hours that Counsel will continue to work in order to bring this case to a close. From now until October, Counsel will no doubt engage in many conversations with opt-in Plaintiffs, send numerous update letters and emails to opt-in Plaintiffs, coordinate with Defendants to arrange for payment and to select a settlement administrator, if required, and verify the final settlement distributions. Counsels' job is not complete after the Court approves the settlement. Indeed, even after October, Counsel will likely receive inquiries as opt-in Plaintiffs receive their checks.

At the Court's request, Counsel also employed an attorney, familiar with local billing practices, to examine Counsel's rates and hours. That attorney, Randy Sparks, found the rates and time expended to be reasonable. *See* Exhibit 1, Declaration of Randy Sparks. In fact, some of the rates are lower than those used in Mr. Sparks firm, which specializes in employment law matters. *Id.*

Counsel note that, even under an extremely conservative view of Counsels' work time and/or rates, the fee request in this case falls well within an acceptable lodestar multiplier. *See, e.g.,*

13

*In re The Mills Corp., Sec. Litig.*, 265 F.R.D. 246, 265 (E.D. Va. 2009) (holding that multipliers between 2 and 4.5 demonstrate a reasonable fee). Counsel submits that the excellent result obtained in this case warrants a multiplier higher than that requested here.

Even if the Court elected to use a straight lodestar analysis, it may increase the fee to account for degree of success and other factors. *In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 786 (E.D. Va. 2001). Counsel contends that the complexity, risk, novel issues, required skill, Counsels' expectations at the start of the litigation, fees in similar cases, and ultimate result (all described in Plaintiffs' motions for approval, this supplement, and accompanying exhibits) warrant a multiplier that justifies at least the fee requested in this case, if not more.

5. **Expenses**

The Court also asked Counsel to provide their itemized expense records. The records are attached hereto. The expense records have been updated to reflect the most recent expenses. Thus, the records show a number higher than previously requested. Plaintiffs respectfully adjust their expense reimbursement request accordingly and ask that the Court award $65,381.59 in expenses. *See* Ex. 8, Counsel's Expenses.

6. **Plaintiffs object to Defendants' filing an opposition to their fee request.**

In light of the Court's position at the Approval Hearing, Plaintiffs recognize that it is futile to argue that Defendants should be prohibited from challenging Plaintiffs' fee request. Still, because a failure to raise an objection often results in a waiver, Plaintiffs are compelled to briefly object to Defendants' contesting Plaintiffs' fee request. Two reasons support Plaintiffs' objection.

First, Defendants did not timely object to Plaintiffs' fee and expense request. Plaintiffs filed their motion for fees and expenses on February 4, 2019. Defendants did not raise with the Court the possibility of wanting to contest fees until the Approval Hearing on March 4, 2019.

If Defendants wanted to object to Counsels' proposed fees, they could have done so. Defendants' *chose* not to contest Plaintiffs' fees request. This only changed when Defendants hired new counsel, who made a late request to file an objection. Defendants provided no justification for the late request to file an out-of-time objection other than, apparently, Defendants' changed their mind regarding what they had already agreed to.

The standard to file a late motion/response is "excusable neglect." *Smith v. Look Cycle USA*, 933 F. Supp. 2d 787, 790 (E.D. Va. 2013). A party changing their mind regarding a chosen strategy is not "excusable neglect." *See, e.g., Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 534 (4th Cir. 1996) ("the [U.S. Supreme] Court specifically observed that it was appropriate to hold a client accountable for the mistakes of counsel, and that 'inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute "excusable" neglect.'" (Internal citations removed.)). As the Court noted at the Approval Hearing, Defendants must live with the decisions of their prior counsel. Prior counsel did not file a timely objection and, thus, Defendants should not to file an objection now.

Second, the Settlement Agreement includes a prohibition against Defendants objecting to Plaintiffs' proposed fees. Defendants' *own counsel* wrote that prohibition in the very first draft of the agreement. Biller Declaration, ¶ 8. Under those circumstances, an attempt to challenge the fee petition breaches the Settlement Agreement.

15

Plaintiffs apologize to the Court for raising these issues, but they felt it was necessary to preserve their objections. Plaintiffs hope that the Court reconsiders allowing Defendants' to file a late objection. Plaintiffs acknowledge that, even if Defendants cannot file an opposition, the Court will conduct a thorough analysis of Plaintiffs' fee request anyway.

7. **Conclusion**

Plaintiffs hope that this Supplement has been helpful. Counsel respectfully ask that the Court award their requested fee of $814,934 and the expense reimbursement of $65,381.59.

Respectfully submitted,

/s/ Julia Rust
Andrew Biller (*admitted pro hac vice*)
Trial Counsel for Plaintiffs
Andrew Kimble (*admitted pro hac vice*)
Counsel for Plaintiffs
BILLER & KIMBLE, LLC
3825 Edwards Road, Suite 650
Cincinnati, OH 45209
513-651-3700 (Phone)
513-665-0219 (Fax)
(abiller@msdlegal.com)
(akimble@msdlegal.com)

Joshua L. Jewett (VSB 76884)
Julia Rust (VSB 87270)
Counsel for Plaintiffs
PIERCE / MCCOY
101 West Main Street, Suite 101
Norfolk, VA 23510
T: 757-216-0226

C. Ryan Morgan (*admitted pro hac vice*)
Morgan & Morgan, P.A.
20 N. Orange Ave., 14th Floor
Orlando, FL 32802-4979
407-420-1414 (Phone)

16

        407-245-3401 (Fax)
        (rmorgan@forthepeople.com)

        Andrew Frisch (*admitted pro hac vice*)
        Morgan & Morgan, P.A.
        600 N. Pine Island Rd., Ste. 400
        Plantation, FL 33324-1311
        954-318-0268 (Phone)
        954-327-3013 (Fax)
        (afrisch@forthepeople.com)

**Certificate of Service**

I hereby certify that I will electronically file the foregoing, which will then send a notification of such filing (NEF) to the following:

Christopher Abel
Wilcox & Savage, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, VA 23510


/s/ Julia Rust

Julia Rust
Counsel for Plaintiffs
PIERCE / MCCOY, PLLC
101 West Main Street, Suite 101
Norfolk, VA 23510
T: 757-216-0226
F: 757-257-0387
E: jjewett@piercemccoy.com